In the United States District Court
for the District of Kansas

————————

Case No. 20-cv-04072-TC

————————

CALEB F. METTILLE,

*Plaintiff*

v.

BNSF RAILWAY COMPANY,

*Defendant*

————————

## MEMORANDUM AND ORDER

Plaintiff Caleb Mettille filed this suit against his former employer, Defendant BNSF Railway Company, alleging several violations of federal employment law on the basis of his disability. Doc. 44. BNSF filed a motion seeking summary judgment on all claims. Doc. 45. For the reasons below, that motion is granted in part and denied in part.

## I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

## B

**1.** BNSF hired Mettille as a Mechanical Foreman I in November 2018. Doc. 47 at 2, ¶ 1. In that role, his duties included "overseeing the maintenance and repair of railcars and locomotives, supervising mechanical shop employees in a union environment, and ensuring compliance with applicable rules, regulations, and policies." *Id.* at 2–3, ¶ 2.

Mettille, a veteran of the United States Marine Corps, was diagnosed in 2011 with post-traumatic stress disorder (PTSD) and a traumatic brain injury (TBI) related to his service. Doc. 47 at 3, ¶ 3. His doctor has opined that the PTSD and TBI affect Mettille's ability to process information, understand social nuance and nonliteral statements, and regulate emotion. *Id.* at ¶ 4; Doc. 60 at 2.

Mettille's application to BNSF did not disclose his conditions, but his post-offer questionnaire did. Doc. 47 at ¶¶ 5–7. Still, Mettille's direct supervisors were not made privy to that questionnaire, and Mettille did not directly inform them of his disabilities or request any accommodations when he began work. *Id.* at ¶¶ 8–10.

Within his first six months on the job, Mettille encountered some difficulty. In May 2019, he received a Letter of Reprimand for failing to comply with instructions to move metal pieces that had caused an employee injury. Doc. 47 at ¶ 15; Doc. 60 at 4–5.[1] In June, Mettille lodged a complaint of his own, reporting to HR Manager Matthew Wheeler a poor management culture that functioned through "fear or threat" of unfounded, undeserved disciplinary actions—what Mettille labeled a culture of "malicious compliance." Doc. 47 at ¶¶ 17–20; Doc. 60 at 8–9. In support, Mettille identified several instances involving his direct supervisor, Assistant General Foreman Derek Diel, and an individual further up Diel's chain of command, General Foreman II Charles Carter. Doc. 47 at ¶¶ 17–20; Doc. 60 at 8–9. There is no genuine dispute that, at the time Mettille complained, Wheeler, Diel, and Carter had no knowledge of Mettille's medical conditions; nor did his complaint reference them. Doc. 47 at ¶¶ 17–20; Doc. 60 at 8–9.[2]

In the summer of 2019, Mettille received his first performance evaluation. In terms of quantitative metrics—across categories of safety, reliability, availability, and cost—Mettille was on track. Doc. 47 at ¶¶ 26–27; *see also id.* at ¶ 28 (explaining the evaluation consisted of two sections, "Leadership Model" and "Business Objectives," the latter of which is a "black and white" assessment where you "either satisfied these numbers or you did not"); Doc. 60 at 17–21. But Mettille received poor ratings on the more qualitative "leadership" segment, which asked supervisors to rate him on five company tenets: "1. Create a compelling vision; 2. Model the way; 3. Lead more[,] Manage Less; 4. Communicate, Communicate, Communicate; [and] 5. Make

---

[1] Mettille controverts BNSF's version of the events leading to the Letter of Reprimand but not that such a letter issued or that it was part of his personnel history. Doc. 47 at ¶ 15.

[2] Mettille argues that his supervisors must have known of his conditions early on, because "[a]lthough Plaintiff did not disclose his disabilities to his leadership directly, . . . it was common knowledge" and he had disclosed his conditions to Assistant General Foreman Briana Szymanski, who was not one of Mettille's supervisors but was in leadership and shared both an office and a close working relationship with Diel. Doc. 47 at ¶ 16. But without specifically identifying any event that could, or should, have given his supervisors direct knowledge, Mettille's generic allegations of knowledge in the workplace do not call into genuine dispute Wheeler, Diel, and Carter's specific, sworn statements that they first learned of Mettille's disabilities later in 2019. *See* Doc. 60 at 7–8; Doc. 45-3 at ¶ 4; Doc. 45-5 at ¶ 3; Doc. 45-6 at ¶ 3; Doc. 45-11 at ¶ 3; Doc. 45-12 at ¶ 3.

Development a Priority." Doc. 47 at ¶ 27. As a result, Diel gave Met-
tille an overall evaluation of "Needs Improvement," explaining in the
comments section that Mettille had "done a good job meeting monthly
requirements" but needed to "focus on improving your leadership
style and owning the messages and directives you are delivering to your
team . . . . Make sure you ask questions prior to delivering messages to
your work group. If you don't fully understand why we are doing
something then it will be impossible to successfully deliver that mes-
sage to your team." *Id.* at ¶¶ 27–28.

   As a result of this evaluation, BNSF placed Mettille on a 90-day
Performance Improvement Plan (PIP), which began in mid-August
2019 and was due to end in mid-November. Doc. 47 at ¶ 30. Three
people approved and issued the PIP: Wheeler in HR, Diel as Mettille's
direct supervisor, and General Foreman III David Miller, who re-
ported directly to Superintendent Henry Schafer (the ultimate head of
Mettille's chain of command). *Id.*; *see also id.* at ¶ 11. There is no genuine
dispute that Miller and Diel still lacked knowledge of Mettille's condi-
tions at this point. *See supra* n.2. But the day after beginning the PIP,
Mettille emailed Wheeler, stating that "as a veteran with PTSD, this is
very adverse for me." Doc. 47 at ¶ 33. Wheeler directed Mettille to
resources for his PTSD but did not inform Mettille's other supervisors
of Mettille's concerns. Doc. 46 at ¶ 34; *see* Doc. 47 at ¶ 34 (attempting
to controvert but failing to identify genuine dispute, as explained in
Note 2).

   The PIP identified several areas for improvement. Doc. 47 at ¶ 31.
These included Mettille's task completion and deadlines, ownership of
messages to his team, improved communication, acquiring resources
that his team needed, and supervising and holding accountable his di-
rect reports. Doc. 46 at ¶ 31; Doc. 47 at ¶ 31; *see also* Doc. 45-2 at 110–
12. As part of the PIP, Mettille began meeting with Wheeler and Diel
weekly. *See* Doc. 47 at ¶ 32; Doc. 45-2 at 112. Diel and Mettille both
made notes throughout the PIP, tracking Mettille's progress. *See* Doc.
45-2 at 112–33.

   That progress, it seems, was a mixed bag. Diel's notes include some
successes, but also several complaints. *See* Doc. 45-2 at 112–31; *see also*
Doc. 60 at 24–41. After two months in the PIP, Diel's feedback in-
cluded positive comments about Mettille completing assigned leader-
ship courses; finding a solution for, and "[doing] a good job communi-
cating" about, a "scrap dumpster situation"; completing initial goals
related to "spot specific task books"; doing "an excellent job with the

audits" (which appear to have been the dominant subject of the PIP's first few weeks); properly escalating a smoke issue in his building (a "big" positive according to Diel); generating positive feedback from "employees on 38 line" that indicated his successful completion of "outshops and audits"; and "taking the lead" successfully on a safety project. Doc. 45-2 at 112–31.

But by that same point in time, there were several documented instances of Mettille failing to timely complete tasks, being unprofessional or too blunt when receiving and giving feedback, and miscommunicating. *See* Doc. 45-2 at 112–31. For example, Mettille had mistakenly told his team that BNSF would be providing lunch on a certain day, when in fact, the event had been cancelled. Doc. 47 at ¶ 43; Doc. 60 at 35–37; *see also* Doc. 45-2 at 122–23. And Mettille instructed his direct reports not to use a company golf cart to transport tools or material, when in fact, the cart had been obtained for those exact purposes. Doc. 47 at ¶ 35; Doc. 60 at 24–25; *see also* Doc. 45-2 at 116. (Mettille, for his part, points to Diel's and Schafer's meaningful roles in these miscommunications. Doc. 47 at ¶¶ 35, 43.[3]) Throughout these first two months of Mettille's PIP, Diel counseled him on taking a more productive, less accusatory tone when providing criticism to direct reports; noted inconsistent progress on his "spot specific task books"; identified instances when he failed to properly escalate or follow up on his team's maintenance and equipment needs; and indicated dissatisfaction with his failure to complete certain tasks, such as the building of a vacuum base. *See* Doc. 45-2 at 112–25.

On October 11, 2019, Mettille first disclosed his PTSD and TBI to his direct supervisor, Diel, and to Superintendent Schafer. Doc. 47 at ¶ 46; Doc. 45-2 at 135–37; Doc. 45-5 at ¶ 3; Doc. 45-6 at ¶ 3. Significantly, this disclosure came by way of a requested ADA accommodation, submitted on BNSF's designated form. Doc. 47 at ¶ 46. That written request included an explanation from Mettille's psychiatrist, Dr. Bono, that Mettille's condition meant he needed responsibilities and tasks "to be spelled out—they should be very clear and not subject to interpretation." *Id.* at ¶ 48; Doc. 60 at 41–42; *see also* Doc. 45-2 at 135–37. Mettille requested that, going forward, his supervisors provide

---

[3] BNSF does not controvert Mettille's additional facts on these subjects. As to the golf cart incident, it simply argues that the additional facts are immaterial. Doc. 60 at 25. And as to the lunch event, BNSF states that it is incorporating "its reply to plaintiff's response to Fact ¶ 39," but BNSF's reply lacks any such reply. *See* Doc. 60 at 37.

5

tasks and goals in writing and in bulleted-list format.[4] Doc. 47 at ¶ 47. Diel agreed. *Id.* at ¶ 61.

Diel followed through on Mettille's accommodation request on two occasions. On October 14, after the first PIP meeting following Mettille's request, Diel emailed Mettille instructions to supplement their verbal PIP discussion. Doc. 47 at ¶ 62. He did so again on October 29. *Id.* at ¶ 67. Diel thought that he sent a third email summarizing an October 22 PIP meeting, but BNSF has not produced any evidence of such a message and Mettille does not remember receiving one. Doc. 47 at 64; *see also* Doc. 60 at 46 ("Diel might have overlooked sending the bulleted task list on this particular occasion.") BNSF does not allege that Diel sent any other written instructions to Mettille.

Also on October 14, Mettille submitted a harassment complaint to Wheeler, alleging that Diel was exhibiting hostility toward Mettille and that other supervisors had also responded inappropriately to Mettille's safety complaints. *See* Doc. 47 at ¶¶ 51–58; Doc. 60 at 44–45. While this written complaint does not reference Mettille's disabilities or expressly allege that the harassment was related to them, it does state that Mettille felt he was being harassed and retaliated against for "voicing concerns." Doc. 47 at ¶ 57; Doc. 60 at 44.

At the time of his disclosure and accommodation request, Mettille had approximately four weeks remaining in his PIP. In that remaining period, Diel again documented positive progress, such as Mettille "involv[ing] employees" and inspiring "them to buy into the process" of getting a delayed project back on track. *See* Doc. 45-2 at 126–31. In a separate instance, Mettille did "a great job covering overtime" by asking appropriate questions to prepare for "his first time running overtime on the weekend." *See id.* But Diel also detailed several issues, including Mettille's failure to properly prepare another employee to cover a planned absence, his confrontation with a subordinate, and several unapproved purchases. *Id.*; Doc. 47 at ¶¶ 45, 59–60, 68–70; Doc. 60 at 40–41, 45, 47–50.

Mettille does not dispute that these events made it into Diel's PIP notes, but he does contest their completeness, characterization, and context. *See, e.g.*, Doc. 47 at ¶¶ 59–60, 68–70; Doc. 60 at 45, 47–50. For

---

[4] Mettille requested several other accommodations as well, which BNSF apparently did not provide but which Mettille does not appear to pursue in this litigation. *See* Doc. 44 at ¶ 3.a.

example, Mettille testified that Diel approved some of the contested expenses (*i.e.*, pocket knives for unboxing materials). Doc. 47 at ¶ 71; Doc. 60 at 50–51. He also points to Diel's deposition testimony wherein Diel admits that he did not clearly instruct Mettille on inappropriate purchases (*e.g.*, winter coats) versus appropriate purchases that BNSF had affirmatively told Mettille to make (*e.g.*, other winter wear such as gloves and balaclavas). Doc. 47 at ¶¶ 70–72; Doc. 60 at 49–52. Mettille also testified that two of his colleagues made similar purchases (*e.g.*, coffee, sugar, etc.) without issue and that he was merely following suit when he placed his orders. Doc. 47 at ¶ 72; Doc. 60 at 52 (failing to controvert Mettille's testimony that he witnessed peers receiving orders of the same nature). Similarly, Mettille quotes Diel's testimony that he had not actually trained Mettille on how to prepare employees to cover absences. Doc. 47 at ¶ 45; Doc. 60 at 40–41. Mettille also provides additional context for a confrontation with his direct report, including that he immediately went to Diel for help with the escalating situation and that Diel was directly involved with handling the event. Doc. 47 at ¶ 68; Doc. 60 at 47–48. And, finally, Mettille quotes testimony from Schafer about another one of Diel's reports, who held the same job as Mettille, and who—despite having "a tendency of letting his emotions take control and get very angry" that culminated, at least once, in a shouting match with supervisors—successfully completed a PIP of his own. Doc. 47 at ¶ 84; Doc. 60 at ¶ 84 (arguing that Mettille "has no evidence of the facts or circumstances" underlying that employee's PIP completion, but failing to controvert pertinent testimony).

On November 6, 2019—around the time that Mettille's PIP was scheduled to end and roughly four weeks after Mettille's accommodation request—Schafer emailed Wheeler about Mettille's purchases and his recent failure to keep PIP notes. Doc. 45-8; *see also* Doc. 46 at ¶ 73; Doc. 47 at ¶ 73. Per these emails, Schafer thought BNSF now had "enough to move forward with termination." Doc. 45-8; Doc. 46 at ¶ 73; Doc. 47 at ¶ 73. Following that email, Schafer sent further justification to Wheeler: that Mettille had on several occasions forgotten to carry a radio and had "lied" that the battery was dead. Doc. 46 at ¶¶ 74–75. (Mettille testified that he had not lied about the battery issue and that radio issues were never discussed in his performance evaluation, PIP, or PIP meetings. Doc. 47 at ¶ 74; Doc. 60 at 53).

The radio issue fills seven of the 24 lines of written justification for Mettille's "Failure to Successfully Complete PIP." Doc. 45-2 at 133.

Other topics rounding out that assessment were Mettille's difficulty receiving feedback without becoming emotional or feeling singled out, Mettille's failure to follow specific instructions on two occasions, and the issue with Mettille's team purchases. *Id.*

Wheeler prepared written requests for approval of Mettille's termination, first on November 8 and then, in final version, on November 12, 2019. Doc. 47 at ¶ 76; *see* Doc. 45-9. That document—which Wheeler drafted but which reflected Diel's review and approval—observed that "[d]uring the course of the PIP, some measurable improvement was observed on the technical aspect of [Mettille's] position." Doc. 45-9 at 3. Nonetheless, the document summarized "high concerns about [Mettille's] leadership skills." *Id.* Those concerns included "dishonesty," in which the radio incident was the only item discussed; "leadership judg[m]ent," which summarized the radio issue, Mettille's failure to make timely PIP notes during the last two weeks of his program, and Mettille's team purchases; "[f]ailure to maintain rules compliance," in which the purchases were the only item listed; an "[i]nability to accept constructive criticism," which described conduct consistent with how Dr. Bono had explained Mettille's PTSD symptoms in his accommodation paperwork; and a "[c]ontinued inability to follow specific instructions that are given to him," which again discussed the radio incident, Mettille's alleged failure to adequately prepare another employee to cover his shift, and the failure to escalate a maintenance request that could be viewed as affecting safety—and which described conduct largely in line with how Dr. Bono had explained Mettille's TBI symptoms. *Id.*

On November 13, with Wheeler's request pending, Mettille reported asphalt damage on company property. Doc. 47 at ¶¶ 80–81; Doc. 60 at 55–58. There is a genuine dispute as to whether Mettille's reporting was accurate. BNSF points to evidence suggesting that Mettille knew that one of his direct reports had caused the damage but, in another display of dishonesty, intentionally withheld information. Doc. 60 at 55–58; *see also* Doc. 45-2 at 170. Mettille, however, identifies evidence that he did not witness the event, that he relayed to supervisors the information he knew to be true, that he suspected his team member had caused the damage, but that Mettille told the team member there would be a full investigation and not to worry until they knew more. Doc. 47 at ¶¶ 80–81; *see also* Doc. 45-2 at 171.

But Mettille was fired before that investigation could occur. On November 15, 2019, BNSF terminated his employment. *See* Doc. 47 at ¶ 84.

Although Mettille does not allege any expressly discriminatory statements from individuals in his chain of management, he does allege three instances of such remarks from others. First, at a family event, a coworker called Mettille "f— weird" in front of Mettille's child. Doc. 47 at ¶ 86. Mettille does not know whether this individual was aware of his conditions, but he does allege that his PTSD was common knowledge among coworkers. *See* Doc. 47 at ¶¶ 88, 91. Second, when Mettille once became nervous while using his radio and stuttered due to a speech impediment, one of Mettille's direct reports—who did not know of Mettille's conditions—asked if he was "going to get it all out there, bud?" Doc. 46 at ¶ 89; Doc. 47 at ¶ 89. Third, and finally, Mettille alleges that a manager to whom Mettille did not report told him that he could not use his conditions "as an excuse." Doc. 47 at ¶ 92.

**2.** After his discharge, Mettille exhausted his EEOC remedies, and then filed this suit. Doc. 44 at ¶ 2.a.viii–x. He advances four separate claims under the Americans with Disabilities Act (ADA),[5] 42 U.S.C. § 12101, *et seq.*: discrimination, failure to accommodate, retaliatory discharge, and harassment. Doc. 44 at ¶ 4.a. BNSF maintains that it fired Mettille exclusively for legitimate and well-documented performance failures, and in its summary judgment papers, argues that Mettille cannot prove otherwise. Doc. 44 at ¶ 4.b.; *see* Doc. 46.

## II

BNSF's motion for summary judgment is granted in part and denied in part. Because Mettille has not identified evidence to support an ADA claim for harassment, BNSF is granted judgment as to that claim. But it is denied judgment as to Mettille's ADA claims for discrimination, retaliation, and failure to accommodate.

## A

Mettille alleges that BNSF discriminated against him on the basis of his disabilities, in violation of the ADA. He relies on circumstantial, rather than direct, evidence. As a result, his claim is evaluated under

---

[5] As amended by the Americans with Disabilities Act Amendments Act (ADAAA).

the *McDonnell Douglas* burden-shifting test. *Hawkins v. Schwan's Home Serv., Inc.,* 778 F.3d 877, 883 (10th Cir. 2015).

That familiar test proceeds in three parts. The plaintiff-employee bears the initial burden of showing a prima facie case, which for Mettille's ADA discrimination claim, requires him to show that he was a "disabled person" as defined in the ADAAA, he was qualified for the position held or desired, and he "was discriminated against because of his disability." *Lincoln v. BNSF Ry. Co.,* 900 F.3d 1166, 1192 (10th Cir. 2018) (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2016)). If he does so, the burden then shifts to BNSF to identify a legitimate, nondiscriminatory basis for its adverse action. If BNSF does, then the burden returns to Mettille to offer evidence that BNSF's proffered reasons were pretextual. *See, e.g., Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir. 2020); *Lincoln,* 900 F.3d at 1193. Plaintiffs "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln*, 900 F.3d at 1193 (quoting *DePaula v. Easter Seals el Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)).

**1.** BNSF contends that Mettille cannot state a prima facie case because he cannot show that BNSF discriminated against him on the basis of his disability. Doc. 46 at 18–19 (expressly accepting, for purposes of summary judgment, that Mettille had a disability and that he was qualified for his role). First, it argues that many of the negative experiences and adverse employment actions that Mettille allegedly experienced predated his supervisors' knowledge of his disabilities. Indeed, although Mettille disclosed his conditions to BNSF generally (by way of his post-offer questionnaire), he did not tell either his direct supervisors or his HR contact about his PTSD and TBI until after he was in a PIP. Thus, BNSF claims, even if Mettille's negative interactions with supervisors or his placement in the PIP could constitute adverse employment action, *but see, e.g., Haynes v. Level 3 Comm'cns, LLC,* 456 F.3d 1215, 1224 (10th Cir. 2006), *abrogated in part, Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68–70 (2006), Mettille cannot show any causal connection between those occurrences and his disabilities.[6]

---

[6] Mettille does not argue or attempt to establish that knowledge of the contents of his employment file, including his post-offer questionnaire, can be imputed to his supervisors. Neither have the parties discussed how that might affect Mettille's temporal-proximity argument.

Even so, once BNSF did gain knowledge of Mettille's disabilities, it decided to terminate him—only four weeks after he disclosed his disabilities and expressly because of performance issues arguably attributable to those disabilities. This is sufficient to satisfy the prima facie element. *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (retaliation context), *overruled in irrelevant part, Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194 (10th Cir. 1998); *Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1156–57 (10th Cir. 2008) (giving "considerable weight" to temporal proximity in ADA discrimination case).

Second, BNSF tries to avoid that conclusion by arguing that Mettille "cannot show a 'nexus' or an otherwise 'logical connection' between his PTSD and the termination." Doc. 46 at 20. BNSF notes that Mettille's supervisors gave him a lackluster evaluation and placed him on a PIP before knowing of his disabilities. It further argues that Mettille's performance on the PIP justified termination. Because "ADA liability cannot be based on actions taken when [the employer] was unaware of [the employee's] disability," *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 898 (10th Cir. 2017), BNSF reasons that it cannot be liable for failing to alter its preplanned course of action simply because, during the process, it discovered that Mettille had a disability. Doc. 46 at 30 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

But unlike the employer in *Clark County*, BNSF cannot show that its mind was made up before Mettille's disclosure. Causation is ordinarily a question of fact. *Cf. McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010). And all that Mettille must show is "'some affirmative evidence that disability *was a determining factor* in the employer's decision.'" *Lincoln*, 900 F.3d at 1193 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).[7] Mettille's supervisors were unaware of his

---

[7] The causation standard for discrimination under 42 U.S.C § 12112 remains arguably unsettled, but plaintiffs need not show their disability was the *sole* cause of alleged discrimination. *See, e.g., Lincoln*, 900 F.3d at 1193; *Crane v. Utah Dep't of Corrs.*, 15 F.4th 1296, 1313 (10th Cir. 2021) (tracing Tenth Circuit's "less certain" precedent before adopting "but for" standard for Section 12132, which—in contrast to Section 12112's "on the basis of" language—prohibits discrimination "by reason of" disability); *cf. Natofsky v. City of N.Y.*, 921 F.3d 337, 348–50 (2d Cir. 2019) (joining "Fourth, Sixth, and Seventh Circuits [to hold] the ADA requires a plaintiff alleging…employment discrimination to prove that discrimination was the but-for cause of any adverse employment action"), *cert. denied*, 140 S. Ct. 2668 (2020); *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105–07 (9th Cir. 2019) (same), *cert. denied*, 140 S. Ct. 2720 (2020).

conditions when he received his "Needs Improvement" evaluation,[8] but that same evaluation rated Mettille well on its more objective performance metrics, and his supervisors elected to place him in a PIP rather than terminate him at that time. This supports an inference that Mettille's performance (as of August 2019) was not so poor as to require termination. And even if his performance on the PIP was less than ideal, BNSF still documented several program successes. Looking at PIP documentation prior to Mettille's disclosure of his disabilities, reasonable minds may differ on the degree of success that he was experiencing. In other words, unlike in *Clark County*, the adverse employment action was not a foregone conclusion before BNSF learned of Mettille's conditions. So while BNSF's argument may be persuasive to a jury, it is not dispositive at the summary judgment stage. *Cf. Lincoln*, 900 F.3d at 1193 ("The burden of production placed on the plaintiff relative to the inference of discrimination element … is not onerous.") (internal quotation marks omitted).

Timing is also a factor that weighs in favor of sending the causation question to a jury. There is ample material to suggest that BNSF's termination decision was performance-based, but it formed its first documented intention to terminate Mettille less than one month after he alerted supervisors to his disabilities. That timing would permit a reasonable factfinder to conclude that Mettille's termination occurred "on the basis of" his disability. *See, e.g.*, *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e must now determine whether termination, standing alone, is sufficient to establish causation. The date of Plaintiff's termination is key to this inquiry because the closer it occurred to the protected activity, the more likely it will support a showing of causation.") (retaliation context); *see also Trujillo*, 524 F.3d at 1156–58 (reversing district court's grant of summary judgment in ADA discrimination case, for failure to consider "the totality of the circumstances" including, together with evidence of defendant's cost concerns, "the temporal proximity between [an expense-producing medical event] and the terminations"); *Ramirez*, 41 F.3d at 596 (observing that close temporal proximity can be "sufficiently probative" of motive to prevent summary judgment). The timeline here is consistent with that in *Trujillo*, where the Tenth Circuit observed that "close" temporal proximity of three weeks for one employee and six weeks for

---

[8] As noted above, Mettille does attempt to dispute this fact. But he offers only a general contention that his conditions were "common knowledge" in the workplace, which is insufficient to call into genuine dispute Diel's and Wheeler's sworn declarations that they, individually, were unaware.

another, together with evidence that "rising healthcare costs" were of concern to the defendant, established a prima facie case of ADA discrimination. 524 F.3d at 1157.

There is also plausible evidence that Mettille's difficulties directly related to the disabilities that he disclosed and for which he sought an accommodation. *See* Doc. 47 at 62–63. Mettille has raised a genuine dispute of material fact as to whether BNSF was motivated by either Mettille's disabilities or conduct attributable to those conditions. Either way, the Tenth Circuit has recognized that the ADA provides protection. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1087–88 (10th Cir. 1997) (internal citation omitted) ("Mental illness is manifested by abnormal behavior, and is in fact normally diagnosed on [that] basis…. To permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection . . . ."). As a result, a jury might find that BNSF's stated reasons for firing Mettille demonstrated animus toward disability-based conduct. Mettille has carried his burden of showing a prima facie case.

**2.** For purposes of summary judgment, BNSF has carried its burden of identifying legitimate, nondiscriminatory reasons for terminating Mettille. Among them are Mettille's alleged inability to fully complete tasks; his unprofessional approach to giving and receiving criticism; unsanctioned expenditures; and specific miscommunications with supervisors and direct reports. *See* Doc. 46 at 20. By the time it completed the termination, BNSF had bolstered its decision with a subsequent incident that it claims indicates dishonesty: Mettille's excuses for not carrying a radio at all times. *Id.* While Mettille generally rejects BNSF's characterization of these events and provides several additional facts disputing or contextualizing these incidents, those arguments speak to pretext. For good reason, Mettille does not dispute that the reasons BNSF has offered would constitute a legitimate, nondiscriminatory basis for his termination. *See* Doc. 47 at 65–66.

**3.** The burden then returns to Mettille to demonstrate either that BNSF's articulated reasons are false or that discrimination was truly the "primary factor" in his dismissal. *Lincoln*, 900 F.3d at 1193. Mettille can do so by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could rationally find them unworthy of credence." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (internal quotation marks omitted). This

showing must amount to more than "[m]ere conjecture that the employer's explanation is a pretext," but the "burden is 'not onerous'" and "all doubts . . . must be resolved in plaintiff's favor." *Morgan*, 108 F.3d at 1323–24. Thus, Mettille need not "actually prov[e] pretext" but must "rais[e] a genuine issue of fact regarding pretext." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) (ADEA context); *compare Morgan*, 108 F.3d at 1324 (affirming summary judgment where plaintiff asserted "her own perceptions of fairness" but offered no evidence that she was treated differently than similarly situated employees), *with Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149–50 (10th Cir. 2011) (observing "there is no one specific mode of evidence required" to show pretext and reversing trial court's finding that plaintiff presented "only a scintilla" of evidence insufficient to support an inference of pretext). Ultimately, all that is required is that a reasonable factfinder *could* rationally determine that the employer's stated reasons are unworthy of belief. *Morgan*, 108 F.3d at 1323.

Mettille argues that he has identified sufficient evidence to dispute not only the accuracy of BNSF's documented reasons for termination but also their significance in the larger working environment. *Cf. Carter*, 662 F.3d at 1149–50 (acknowledging the legitimacy of firing an employee for coworker altercation and use of expletives with supervisor, but observing that "in the context of the oil field, where employees complete strenuous tasks and work long shifts" reasonable jurors "could have nonetheless concluded that [plaintiff] was *actually* fired because of his disability"). Specifically, Mettille points to the close timeframe between his disclosure and his termination, the positive feedback he received around the same time on various items, the different treatment that he argues similarly situated employees received, and the "inconsistencies and weaknesses" in the PIP's written evaluation. Doc. 47 at 68.

There is colorable evidence of differential treatment. For example—looking only at the stated reasons for which Mettille failed to successfully complete his PIP—BNSF points to Mettille's purchases of team gear and supplies with company funds, including after he was informed certain purchases were improper. But Mettille provides evidence not only that he unsuccessfully sought guidance from Diel before making certain purchases but also that other individuals with Mettille's same job had made similar purchases for their teams without consequence. BNSF also blames Mettille for responding unprofessionally to emailed criticism from Diel. But Mettille identifies another

individual with Mettille's same job on another team, who also directly
reports to Diel and who, according to Superintendent Schafer, has a
"tendency" to lose control of his emotions and has at least once en-
gaged his supervisors in a shouting match, but who nonetheless suc-
cessfully completed his own PIP.

There is also evidence suggesting that a predominate reason BNSF
gave for termination was a last-minute justification. Specifically, BNSF
points to Mettille's failure to reliably carry his radio and his alleged dis-
honesty in explaining that failure. But the issue with Mettille's radio
does not appear in any of Diel's detailed PIP entries—yet it accounts
for roughly one-third of the section documenting BNSF's decision to
terminate Mettille. A reasonable jury might view this disconnect as ev-
idence of pretextual, post hoc justification. *Cf. Foster v. Mt. Coal Co.,
LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) (observing reasonable ju-
rors could find pretext due to "inconsistent reasons for terminat[ion],"
where two employees testified that the fired employee had "alleged dis-
providing" a certain form, while another testified that the problem
with the form was it "didn't have the right date . . . and stuff on it").

And finally, there is evidence that BNSF's decision was based on
conduct directly attributable to Mettille's disability. Specifically, Met-
tille has produced evidence to suggest that, by the time of his termina-
tion, BNSF knew that Mettille's disabilities affected his ability to un-
derstand and interpret ambiguous instructions. This is significant be-
cause BNSF claims that a primary reason it fired Mettille was his failure
to follow instructions, citing specific instances where Mettille failed to
observe a safety directive and failed to adequately prepare an employee
to cover a shift for Mettille.

The ADA does not deputize the federal courts to second-guess
nondiscriminatory business judgments, no matter how misguided or
unfair they may be. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249,
1260–61, 1266 (10th Cir. 2001). The only "relevant question is whether
the reason articulated by the employer was the real reason for the chal-
lenged action." *Id.* at 1261. In other words, the judicial system is not a
"super personnel department," evaluating the legitimacy of honestly
held reasons for termination. *Young v. Dillon Cos.*, 468 F.3d 1243, 1250
(10th Cir. 2006). But juries may judge whether those reasons were, in
fact, honestly held. While BNSF may be correct in forecasting that a
jury will find in its favor, Mettille has identified evidence that could
support disparate treatment, temporal proximity, and animus toward

disability-related conduct. The jury must therefore be the arbiter of whether BNSF's reasons for discharging Mettille were mere pretext.

**B**

Mettille also contends that BNSF violated his rights by failing to accommodate his disability. Doc. 44 at ¶ 4.a.iii. Specifically, Mettille claims that he needed to receive written instructions in a bullet-point format, supplementing any verbal assignments or goals, due to cognitive difficulties attributable to his TBI. *Id.* at ¶ 3.a.

An employer violates the ADA's accommodation requirements when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Lincoln*, 900 F.3d at 1204 (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017)). Consequently, a prima facie case requires a plaintiff to show that "(1) he is disabled; (2) he is otherwise qualified; and (3) he requested a plausibly reasonable accommodation." *Id.* Once that occurs, "the burden shifts to the employer to present evidence either (1) conclusively rebutting . . . plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Id.* (internal quotation marks omitted). Significantly, this claim does not require any showing of discriminatory intent, *Punt*, 862 F.3d at 1049, or adverse employment action, *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 792 (10th Cir. 2020).

BNSF makes two arguments at this stage. First, it argues that Mettille's requested accommodation was unreasonable, and second, that even if it was reasonable, BNSF provided it to Mettille. Doc. 46 at 26.

**1.** BNSF's reasonableness argument has two separate aspects. Neither is viable.

In one, BNSF argues that it was "unreasonable to require a mechanical foreman's supervisors to guarantee that any directive to him will be reduced to writing." Doc. 46 at 27. Imagine how unwieldy, its argument goes, if a "leader would be required to hold off on issuing a verbal order to plaintiff to rectify a hazardous safety condition, instead taking the additional time to reduce the request to writing." *Id.*

That argument is a strawman. Mettille did not request that his supervisors refrain from giving him any verbal instructions, much less urgent safety instruction. Instead, he asked that his supervisors follow up on verbal instructions or goals with a writing that he could review to make sure he was completing the tasks and understanding the directions. The test for reasonableness is an accommodation "which presently, or in the near future, enable[s] the employee to perform the essential functions of his job." *Aubrey*, 975 F.3d at 1007. Under that definition, BNSF's extreme example does not prevent Mettille's request from being a "plausibly reasonable" one.

The other aspect of BNSF's reasonableness argument is that the requested accommodation did not enable Mettille "to carry out his job duties to BNSF's satisfaction." Doc. 46 at 27 (summarizing the other "performance deficiencies" for which Mettille was allegedly terminated). That, too, misses the mark: the purpose of an accommodation requirement is not to guarantee that an employee will be successful, but to enable "those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) (emphasis omitted); *see also Exby-Stolley*, 979 F.3d at 796–97 (observing that failure-to-accommodate claims do not focus on preventing adverse action against employees but rather on compelling employers to fulfill their affirmative duty to accommodate). The relevant question, then, is whether Mettille's requested accommodation would have placed him on the same footing as other employees vis-a-vis some essential job function—not whether it would have prevented his ultimate discharge. *Cf. US Airways, Inc.*, 535 U.S. at 397; *Exby-Stolley*, 979 F.3d at 796. Mettille has presented evidence from his psychologist to support the conclusion that written instructions would have enabled him to perform at least some of his essential job functions despite his PTSD and TBI. That suffices. *Aubrey*, 975 F.3d at 1005 ("Establishing a prima facie claim [of failure to accommodate] is not onerous.").

And BNSF's argument proves too much. If BNSF believed the accommodation was unreasonable, then it was required to engage in a "reasonably interactive manner" to address the request. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999). Thus, even if BNSF did not view Mettille's request as reasonable or likely to give Mettille an equal opportunity, then it had the obligation under the ADA to meaningfully engage with him in good faith to attempt to find

an accommodation that would be workable for both parties. *See id.* There is no indication that this occurred.

**2.** Second, BNSF argues that, reasonable or not, it *did* provide Mettille's requested accommodation. Doc. 46 at 27–28. But the facts on this point are indefinite. Mettille requested his accommodation via BNSF's formal channels on October 11 and reiterated that verbal request to Diel during their PIP meeting a few days later. The record shows that one month elapsed between when BNSF allegedly began providing that accommodation and when BNSF fired Mettille in November. In that time, Diel provided only two writings per the accommodation. That spotty compliance, followed shortly by Mettille's termination, does not conclusively point one way or the other. A jury will have to determine whether BNSF's performance was sufficient.

## C

Mettille also alleges that he was terminated in retaliation for requesting an accommodation and complaining about his treatment. Doc. 44 at ¶ 4.a.iv–v. That claim again implicates *McDonnell Douglas* burden shifting. Mettille may carry his burden of a prima facie case by showing that he engaged in protected opposition to discrimination, a reasonable person would have found the challenged action to be materially adverse, and a causal connection exists between the protected activity and the materially adverse action. *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009).

BNSF's summary judgment arguments, as with Mettille's discrimination claim, focus on causal connection and pretext. Doc. 46 at 29–31. But those same questions of fact that precluded summary judgment on the discrimination claim also apply to the retaliation claim. *See supra* Part II.A. As a result, Mettille's claim for retaliatory discharge may proceed to trial too.

## D

Finally, Mettille argues that his coworkers and supervisors harassed him because of his disability. Doc. 44 at ¶ 4.a.ii. To succeed on such a claim, plaintiffs must show a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 849 F.3d at 897. "General harassment alone" will not suffice. *Id.*; *cf. Faragher v. City of Boca Raton*,

524 U.S. 775, 788 (1998) ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"). In determining whether the alleged harassment effectively "alter[ed] the conditions" of Mettille's employment, relevant considerations are the conduct's frequency, severity, nature (*i.e.*, whether physically threatening, humiliating, or "merely" generally offensive), and effect on work performance (*i.e.*, "whether it unreasonably interferes"). *Williams*, 849 F.3d at 897.

Mettille lacks evidence of severe or pervasive harassment. The parties seem to agree that there are three discrete instances. In one, a coworker who was unaware of any disability or speech impediment mocked Mettille for one instance of stuttering. Two other times, employees who were allegedly aware of Mettille's PTSD made derogatory comments, calling him "f— weird" and telling him he could not use his condition "as an excuse."[9] Mettille's response is silent as to whether, or how, these occurrences represent sufficient evidence to allow a harassment claim to proceed. *See* Doc. 47. Tenth Circuit precedent confirms that these infrequent interactions will not suffice. *See Williams*, 849 F.3d at 897. They were infrequent, unrepeated instances that lack any component of physical threat or work interference—and Mettille has not shown how they resulted in a de facto alteration of the terms of his employment. *See id.*

### III

For the reasons set forth above, BNSF's motion for summary judgment, Doc. 45, is GRANTED in part and DENIED in part.

It is so ordered.

Date:  February 23, 2022              s/ Toby Crouse
                                     Toby Crouse
                                     United States District Judge

---

[9] The employee who told Mettille not to use his PTSD "as an excuse" was a manager. But Mettille does not appear to ascribe special significance to her role for purposes of his harassment claim. Indeed, she was not in Mettille's chain of reporting, and Mettille offers no facts to suggest she had "authority over [Mettille] or at least some control over [his] working environment." *See Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 755 n.19 (10th Cir. 2014).